**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMA MULTIMEDIA, LLC, a Nevada limited liability company, *Plaintiff-Appellant*, <br><br> v. <br><br> MARCIN WANAT, a foreign citizen; MACIEJ MADON, a foreign citizen; MW MEDIA, a foreign corporation, *Defendants-Appellees.* | No. 18-15051 <br><br> D.C. No. 2:15-cv-01674-ROS <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted June 11, 2019
Submission Withdrawn December 20, 2019
Resubmitted August 10, 2020
San Francisco, California

Filed August 17, 2020

Before: Ronald M. Gould, Sandra S. Ikuta, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge Ikuta;
Concurrence by Judge R. Nelson;
Dissent by Judge Gould

# SUMMARY[*]

## Personal Jurisdiction

The panel affirmed the district court's dismissal for lack of personal jurisdiction of a copyright infringement, trademark infringement, and unfair competition action.

Defendant, a citizen and resident of Poland, operated ePorner, an adult video website, through MW Media, a Polish civil law partnership. Plaintiff contended that defendant was subject to specific personal jurisdiction in the United States because he expressly aimed tortious conduct at the forum.

Applying Federal Rule of Civil Procedure 4(k)(2), known as the "federal long-arm statute," the panel held that the exercise of personal jurisdiction would not comport with due process because defendant lacked the requisite minimum contacts with the United States. The panel concluded that defendant committed intentional acts by establishing and maintaining ePorner, registering two domains, and entering into an agreement with an American domain name server, but he did not expressly aim his suit-related conduct at the United States.

The panel also held that the district court did not abuse its discretion by limiting the scope of plaintiff's jurisdictional discovery on the basis of privacy concerns. The panel declined to consider, for the first time on appeal,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a European Commission decision, known as the "Privacy Shield Decision," which established that Member States, including Poland, could transfer personal data to certain organizations in the United States. The panel also declined to consider the European Parliament's enactment of the General Data Protection Regulation, which repealed and replaced Poland's Personal Data Protection Act after this appeal was filed.

Concurring in the majority opinion in full, Judge Ikuta wrote that because the district court lacked personal jurisdiction over defendants, it had authority only to remove the case from its docket.

Concurring, Judge R. Nelson wrote that the district court was not precluded from exercising its discretion on remand to consider intervening law in any supplemental request for jurisdictional discovery or amendment of the complaint.

Dissenting, Judge Gould wrote that, taking the undisputed facts alleged by plaintiff as true and resolving any factual disputes in its favor, defendant targeted his economic activity toward the United States under the *Calder* "effects test." In addition, plaintiff's claims arose out of or related to defendant's forum-related activities, and it was reasonable to exercise personal jurisdiction over defendant. Accordingly, Judge Gould would hold that the United States had personal jurisdiction over defendant.

## COUNSEL

Marc J. Randazza (argued) and Ronald D. Green, Randazza Legal Group PLLC, Las Vegas, Nevada, for Plaintiff-Appellant.

Jakub P. Medrala (argued), The Medrala Law Firm PLLC, Las Vegas, Nevada, for Defendants-Appellees.

---

## OPINION

R. NELSON, Circuit Judge:

AMA Multimedia, LLC ("AMA") appeals the district court's dismissal of its copyright infringement, trademark infringement, and unfair competition action against Marcin Wanat for lack of personal jurisdiction. We agree with the district court that AMA has not met its burden of showing that Wanat is subject to personal jurisdiction in the United States. We also conclude that the district court did not abuse its discretion by denying AMA certain jurisdictional discovery and decline to consider arguments about changes in European law for the first time on appeal that bear on AMA's entitlement to additional jurisdictional discovery. We therefore affirm.

## I

Plaintiff AMA is a Nevada limited liability company that produces and distributes "adult entertainment over the Internet." AMA owns several online websites where paying customers can view AMA's materials. AMA's videos are copyrighted as audiovisual works and display the company's trademark in the corner of the screen.

AMA discovered that ePorner.com ("ePorner")—an internationally available website which hosts adult videos and allows users to search for, select, and watch them—was displaying AMA's copyrighted works. At the time this suit was filed, ePorner allowed users to upload adult videos anonymously. ePorner does not charge visitors; instead, it

generates revenue solely through advertising. ePorner contracts with a third-party advertising company that chooses the advertisements. The advertiser then "geolocates" the advertisements, meaning visitors to ePorner.com see advertisements based on their perceived location. For example, visitors thought to be in the United States see selected advertisements in English, while visitors thought to be in France see selected advertisements in French.

AMA was unable to determine who owned and operated ePorner, so, in 2015, AMA sued all defendants as Doe Defendants and Roe Corporations in the United States. The district court permitted AMA to conduct early discovery to ascertain who owned the domains epornergay.com and eprncdn.com, both of which forwarded visitors to ePorner.com. That early discovery revealed that two companies located in Arizona, GoDaddy.com and Domains by Proxy, were used to register the domains and privatize the owner's identity. AMA subpoenaed both companies and learned that Defendant Marcin Wanat was the registrant of the domains. AMA amended its complaint and named Wanat as a defendant.[1]

Wanat is a citizen and resident of Poland. Wanat and Madon are partners in MW Media, a Polish civil law partnership which owns and operates ePorner. Through MW Media, Wanat assists in the operation of ePorner. Although

---

[1] AMA was unable to serve the other named defendants, *i.e.*, the individual, Maciej Madon, and the foreign corporation, MW Media, S.C. ("MW Media"), within the time set forth by the district court and those defendants were thereafter dismissed.

Wanat registered epornergay.com and eprncdn.com, he did not register the ePorner.com domain.

Through his operation of ePorner, Wanat maintains limited contacts with the United States. Wanat registered the domain names through GoDaddy.com, an American company, but did so from Poland using a Polish version of GoDaddy's website. Wanat also entered into an agreement with an American domain name server ("DNS"), Tiggee LLC (doing business as DNSMadeEasy.com) ("Tiggee"), that allows users to access ePorner more efficiently by translating its domain names into Internet Protocol addresses.

However, Wanat has never visited the United States, has never paid taxes in the United States, does not have a visa to travel to the United States, and has never "derived any profit from any of [his] activities in the [United] States as [he] conduct[s] no such activities." Nor do Wanat, MW Media, or ePorner maintain any offices or agents in the United States.

At the time this suit was filed, the adult content available on ePorner was stored on a server in the Netherlands. Wanat stated he does not "specifically target any of [his] services to residents of the [United] States." 19.21% of ePorner's visitors are in the United States, making the United States its largest market.

AMA asserted federal claims for copyright infringement, trademark infringement, and unfair competition. Wanat moved to dismiss based on a lack of personal jurisdiction. After a hearing, the district court ordered jurisdictional discovery.

AMA sought documents related to epornergay.com and eprncdn.com, including contracts and correspondence between the websites and U.S. companies. Wanat objected to several of AMA's discovery requests, primarily arguing that producing certain personal data as part of the requested discovery would expose him to criminal liability under Poland's Personal Data Protection Act of 29 August 1997 ("PDP"). AMA argued that exceptions to the PDP allowed Wanat to produce the data and that, even if the exceptions did not apply, Wanat could redact such personal information.

The district court appointed a Special Master agreed upon by the parties and familiar with U.S. and Polish law to resolve the discovery disputes. *See* Fed. R. Civ. P. 53. AMA and Wanat hired their own Polish lawyers to evaluate Wanat's discovery objections. In June 2016, AMA filed a Motion to Compel and Wanat filed a Motion for Protective Order. In an exhibit to his Motion for Protective Order, Wanat raised the fact that changes to the European privacy laws were under consideration. Specifically, his Polish law expert noted that work on a "Privacy Shield" that could replace the PDP's "Safe Harbor" provision was in progress and could affect the transfer of personal data from European countries to the United States. AMA did not address this potential change in the law in its briefing.

On July 12, six days after the parties completed their briefing to the Special Master, the European Commission issued its Implementing Decision (EU) 2016/1250[2] (the "Privacy Shield Decision"), which, among other things, established that Member States (including Poland) could transfer personal data to certain organizations in the United

---

[2] Available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32016D1250&from=EN

States that committed to a set of privacy principles and self-certified their adherence to these principles to the Department of Commerce. *See id.* §§ 2, 2.1. Neither party raised this change in law with the Special Master, and AMA did not argue that it was a self-certified organization or provide any evidence to that effect.

On August 22, the Special Master submitted its 52-page Report and Recommendation to the district court. Most of the discovery disputes addressed by the Special Master did not involve the application of the PDP.

The Special Master recommended some of AMA's discovery requests involving personal information be denied because responding to the requests would require Wanat to produce "personal data," potentially exposing him to criminal liability under the PDP. The Special Master explained that personal data could not be transferred to the United States because: (1) the PDP's "Safe Harbor" provision, which allows the transfer of such data to certain countries that provide "adequate level[s] of personal data protection," did not apply to the United States, and (2) none of the PDP's other exceptions permitting such transfer applied. As to the first point, relying on the Court of Justice of the European Union's decision in Case C-362/14, *Schrems v. Data Prot. Comm'r*, 2015 E.C.R. 650, the Special Master determined that "the U.S. has been deemed a Third Country that does not ensure a level of protection that meets European standards."

AMA thereafter submitted its Objections to Special Master's Report and Recommendation, but did not raise the Privacy Shield Decision in its briefing. The Special Master's Report and Recommendation did not address the recent implementation of the Privacy Shield Decision. Adopting the recommendations of the Special Master in full, the

district court sustained Wanat's objections to AMA's discovery requests.  AMA moved for reconsideration, but again did not raise the Privacy Shield Decision.  The district court denied the motion.  Wanat then renewed his motion to dismiss for lack of personal jurisdiction.  The district court granted the motion to dismiss, holding that because AMA could not establish sufficient minimum contacts between Wanat and the United States, asserting specific jurisdiction over Wanat would be unreasonable.  AMA timely appealed, challenging both the jurisdictional and discovery orders.

After two extensions, AMA filed its opening brief on June 18, 2018.  But twenty-four days earlier, the European Parliament repealed and replaced the PDP with the General Data Protection Regulation (EU) (2016/679) ("GDPR"),[3] which also addressed the transfer of personal data outside of EU Member States, although not specifically focused on transfers to the United States.  Neither party mentioned the Privacy Shield Decision or the GDPR in their briefs.  Following oral argument, we withdrew submission of the appeal and directed the parties to file supplemental briefs on several issues, including the effect of the Privacy Shield Decision on this appeal.  We did not inquire about the GDPR, although AMA discussed it in its supplemental brief.  AMA did not argue or provide evidence that it is a self-certified organization under the Privacy Shield Decision in its supplemental brief.

## II

We review de novo the district court's dismissal for lack of personal jurisdiction.  *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  "The factual findings underlying

---

[3] *Available at* https://gdpr-info.eu/.

the district court's jurisdiction determination are reviewed for clear error." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018). AMA "bears the burden of establishing that jurisdiction is proper." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). Because Wanat's motion to dismiss was based on written materials rather than an evidentiary hearing, AMA need only make a prima facie showing of jurisdictional facts to withstand dismissal. *See id.* This prima facie standard "is not toothless," however; AMA "cannot simply rest on the bare allegations of its complaint." *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) (internal quotation marks omitted). Although "uncontroverted allegations in the complaint must be taken as true" and "[c]onflicts between parties over statements contained in affidavits must be resolved in [AMA's] favor," *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004), disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction, *see In re Boon Glob. Ltd.*, 923 F.3d at 650.

We review the district court's decision to limit the scope of jurisdictional discovery for abuse of discretion. *Boschetto*, 539 F.3d at 1020. "The district court's refusal to provide such discovery, 'will not be reversed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant.'" *Id.* (quoting *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)).

## III

AMA contends Wanat is subject to specific jurisdiction in the United States because he expressly aimed tortious conduct at the forum. We agree with the district court and

hold that Wanat lacks the requisite minimum contacts with the United States.

## A

Personal jurisdiction over an out-of-state defendant is proper where permitted by a long-arm statute and where the exercise of jurisdiction does not violate federal due process. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). Here, AMA asserts that Federal Rule of Civil Procedure 4(k)(2), known as the "federal long-arm statute," *id.* at 1159, permits the exercise of personal jurisdiction over Wanat. Rule 4(k)(2) contains three requirements:

> First, the claim against the defendant must arise under federal law. Second, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction. Third, the federal court's exercise of personal jurisdiction must comport with due process.

*Id.* (internal citation omitted). Because there is no dispute the first two requirements are satisfied, we address only whether the exercise of personal jurisdiction over Wanat comports with due process.

Due process requires that a defendant who is not present in the forum has "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). "The due process analysis under Rule 4(k)(2) is nearly identical to traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between [defendant] and the

forum state, we consider contacts with the nation as a whole." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007).

Turning to the due process analysis, we conduct a three-part inquiry to determine whether a nonresident defendant has such "minimum contacts" with the forum to warrant the court's exercise of specific jurisdiction:

> (1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[] himself of the privileges of conducting activities in the forum";
>
> (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and
>
> (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Axiom Foods, Inc. v. Acerchem Int'l, Inc*., 874 F.3d 1064,1068 (9th Cir. 2017) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995). AMA bears the burden to establish the first two prongs. *See Axiom*, 874 F.3d at 1068.

The first prong requires AMA to show that Wanat either "purposefully direct[ed] his activities" at the United States or "purposefully avail[ed] himself" of the forum. *Id*. However, "[t]he exact form of our jurisdictional inquiry

depends on the nature of the claim at issue." *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015). AMA alleges copyright and trademark infringement claims, which sound in tort, so we apply a "purposeful direction" analysis and ask whether Wanat has purposefully directed activities at the United States.[4] *See Axiom*, 874 F.3d at 1069; *Mavrix*, 647 F.3d at 1228.

Where allegedly tortious conduct takes place *outside* the forum and has effects inside the forum, our circuit has examined purposeful direction using an "effects test" based on *Calder v. Jones*, 465 U.S. 783 (1984). *See Mavrix*, 647 F.3d at 1228–29 (applying the "effects test" in a copyright infringement case); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321–22 (9th Cir. 1998) (applying the *Calder* test in a trademark dilution case). Under this test, "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix*, 647 F.3d at 1228 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)).

## B

We first conclude that Wanat committed an intentional act. For purposes of jurisdiction, a defendant acts intentionally when he acts with "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."

---

[4] If the exercise of jurisdiction over these claims were proper, we may assert "pendent personal jurisdiction" over AMA's additional claim for unfair competition because it arises out of a common nucleus of operative fact. *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).

*Schwarzenegger*, 374 F.3d at 806.  The district court found, and Wanat acknowledges, that he is one of the partners of MW Media, which owns ePorner.  From Poland, Wanat registered two proxy domains—epornergay.com and eprncdn.com—via GoDaddy's Polish website (a company whose primary place of business is in Arizona).  He also purchased secondary DNS services from Tiggee (based in Virginia).  Both proxy domains direct traffic to ePorner. Each of Wanat's actions were intentional acts which satisfy this first prong.  *See, e.g., Brayton Purcell*, 606 F.3d at 1129 ("operating a passive website was an intentional act") (citation omitted); *Pebble Beach*, 453 F.3d at 1156 (operating a website was an intentional act where the claim arose out of the website name's infringement of a trademark).

## C

We next determine whether AMA has shown that Wanat "expressly aimed" his intentional acts—establishing and maintaining ePorner, registering the two domains, and purchasing the DNS services—at the United States.[5] *Schwarzenegger*, 374 F.3d at 806.  In *Mavrix*, we applied the *Calder* test to analyze whether Brand Technologies, Inc. ("Brand") was subject to specific jurisdiction in California.

---

[5] In *Walden*, the Supreme Court rejected our prior decisions holding that the express aiming element could be satisfied by a defendant's knowledge that harm may be inflicted on a plaintiff in a particular forum. *Axiom*, 874 F.3d at 1069–70.  We noted that the *Walden* decision required us to focus instead on defendant's intentional conduct that is aimed at, and creates the necessary contacts with, the forum state.  *Id.* at 1068–69.  "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden v. Fiore*, 571 U.S. 277, 286 (2014).

647 F.3d at 1227–32.  The plaintiff, Mavrix Photo, Inc. ("Mavrix"), a Florida corporation in the business of selling photos of celebrities with connections to California, sued Brand, an Ohio corporation, for posting copyrighted photos belonging to Mavrix on Brand's website devoted to celebrity gossip.  *Id.* at 1221–23.  Brand's website made money from "third-party advertisements for jobs, hotels, and vacations in California."  *Id.* at 1222.  Brand also had several agreements with California businesses, including an agreement with a news site, a web designer, an internet advertising agency that placed advertisements on the website, and a wireless provider which hosted a mobile version of the website for its users.  *Id.*

We noted the difficulty of determining "whether tortious conduct on a nationally accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed."  *Id.* at 1229.  We explained that operating "a passive website alone cannot satisfy the express aiming prong," but doing so in conjunction with "something more—conduct directly targeting the forum—is sufficient."  *Id.* (internal quotation marks omitted).  But we held that a website's operators can be said to have "expressly aimed" at a forum where a website "with national viewership and scope appeals to, and profits from, an audience in a particular state."  *Id.* at 1231.

Looking to Brand's conduct, we concluded that it "continuously and deliberately exploited the California market for its website."  *Id.* at 1230 (internal quotation marks omitted).  "[M]ost salient" was its intentional use of "Mavrix's copyrighted photos as part of its exploitation of the California market for its own commercial gain."  *Id.* at 1229.  The context was significant:

> Brand operated a very popular website with a specific focus on the California-centered celebrity and entertainment industries. Based on the website's subject matter, as well as the size and commercial value of the California market, we conclude that Brand anticipated, desired, and achieved a substantial California viewer base. This audience is an integral component of Brand's business model and its profitability.

*Id.* at 1230. We concluded that holding Brand "answerable in a California court for the contents of a website whose economic value turns, in significant measure, on its appeal to Californians" did not violate due process. *Id.*

Here, AMA argues Wanat expressly aimed ePorner at the U.S. market, as evidenced by: (1) Wanat's use of geo-targeted advertisements and the purported corresponding U.S. revenue, (2) ePorner's U.S. viewer-base, which comprises 19.21% of the site's total visitors, (3) ePorner's Terms of Service ("TOS"), referred to as a "contractual agreement," and (4) the use of the U.S.-based Tiggee. We hold that AMA has failed to meet its burden of demonstrating that Wanat expressly aimed his intentional acts at the United States.

Although similar in some respects, this case materially differs from *Mavrix* in several important respects. First, Brand's website had "a specific focus on the California-centered celebrity and entertainment industries." *Mavrix*, 647 F.3d at 1230. "*Based on the website's subject matter* . . . we conclude[d] that Brand anticipated, desired, and achieved a substantial California viewer base." *Id.* (emphasis added). By contrast, ePorner lacks a forum-

specific focus. As the district court noted, "the market for adult content is global," evidenced by the fact that the other 80% of ePorner's viewers were outside the United States.

Second, although, according to AMA, ePorner "features a significant portion of U.S.-based content from producers like AMA and U.S.-based models," this does not mean ePorner's subject matter is aimed at the U.S. market to the same degree Brand's website was aimed at California. ePorner's content is primarily uploaded by its users, and the popularity or volume of U.S.-generated adult content does not show that Wanat expressly aimed the site at the U.S. market. *See Walden*, 571 U.S. at 284 ("[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum State.") (emphasis in original) (internal quotation marks omitted). Instead, it merely suggests the United States produces a significant quantity of adult content or that ePorner's users are more likely to upload content produced in the United States. Although Wanat may have foreseen that ePorner would attract a substantial number of viewers in the United States, this alone does not support a finding of express aiming. *See id.* at 289 (rejecting our conclusion that a defendant's knowledge of a plaintiff's strong forum connections plus foreseeable harm in the forum comprises sufficient minimum contacts); *see also Axiom*, 874 F.3d at 1069–70; *Pebble Beach*, 453 F.3d at 1158 (rejecting an argument for express aiming that "relie[d] almost exclusively on the possible foreseeable effects").

Third, ePorner's forum-based website traffic does not have the same relevance here as it did in *Mavrix* because of the differences in the websites' advertising structures. In *Mavrix*, the "substantial number of hits" to Brand's site from Californians was relevant because advertisements on Brand's site targeted California residents, meaning website

hits from Californians translated to more advertising revenue from the site's California advertisers. 647 F.3d at 1230. Brand's knowledge of this user base meant that it "anticipated, desired, and achieved a substantial California viewer base." *Id.* We found it immaterial whether Brand or the third-party advertisers targeted Californians because the targeting itself indicated that Brand knew about the California user base which it then exploited "for commercial gain by selling space on its website for advertisements."**[6]** *Id.* "This audience [was] an integral component of Brand's business model and its profitability." *Id.* In short, the more California viewers Brand could bring to its website, the more money it would make from its advertisements directed to Californians.

Here, nearly 20% of ePorner's traffic comes from U.S. users. But this does not establish that Wanat expressly aimed at the U.S. market, because ePorner's advertising structure materially differs from Brand's. AMA alleges, and Wanat's expert agreed, that ePorner uses geo-located advertisements, which tailor advertisements based on the perceived location of the viewer. This tailoring does not establish that Wanat *expressly aimed* ePorner at the United States. ePorner's geo-located advertisements, provided by a third-party advertising company, unlike Brand's, are *always* directed at the forum: a viewer in the United States will see advertisements tailored to the United States while a viewer in Germany will see advertisements tailored to Germany. Wanat does not personally control the advertisements shown on the site, as ePorner contracts with third parties (not

---

**[6]** To the extent the *Mavrix* court found the website's traffic relevant to targeting, *Walden* made clear that the third-party advertiser's behavior cannot be attributed to the defendant as a contact. *See Walden*, 571 U.S. at 284.

located in the United States) which tailor the advertisements themselves or sell the space to other parties who do. ePorner's forum-based traffic, absent other indicia of Wanat's personal direction, does not establish that Wanat tailored the website to attract U.S. traffic.

If such geo-located advertisements constituted express aiming, ePorner could be said to expressly aim at *any* forum in which a user views the website. As we recognized in *Mavrix*, "[n]ot all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every [forum] in which it is accessed." 647 F.3d at 1231. As a feature of the geo-located advertisements on ePorner's website, all users in every forum received advertisements directed at them. To find specific jurisdiction based on this would run afoul of the Supreme Court's directive in *Walden* and "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."[7] *Walden*, 571 U.S. at 289.

Wanat's other contacts with the United States also fail to establish express aiming. AMA argues that ePorner's TOS suggest that ePorner (and presumably Wanat) entered into contracts with many U.S. residents because anyone who

---

[7] In *Mavrix*, we stated that where "a website with national viewership and scope appeals to, and profits from, an audience in a particular state, the site's operators can be said to have 'expressly aimed' at that state." 647 F.3d at 1231. Here, the same concept applies to whether ePorner, a website with an international audience, is appealing to, and profiting from, users in the United States. We find, however, ePorner does not "*appeal*[] *to*" the United States such that it could be said to have "expressly aimed" at the forum. True, ePorner "profits from" the United States. But the profit results from ePorner's *users* who access the site rather than from Wanat's targeting of forum users who access the site. This differs from Brand's website which targeted California users through the website's content.

joined the site assented to the TOS, thereby forming a contract. Whether or not the TOS constitutes a contract, it does not evince Wanat's or ePorner's effort to target the U.S. market. Any dispute with U.S. residents arising out of the performance of the TOS could create specific jurisdiction in the United States for violation of those terms. But AMA does not allege violations of the TOS. The TOS therefore does not establish any targeting of the U.S. market; it at most suggests Wanat knew ePorner might have U.S. traffic. *See Axiom*, 874 F.3d at 1069–70.

Finally, the use of Tiggee to register certain domain names related to the website does not show targeting of the U.S. market. AMA contends that the use of Tiggee, which advertises itself as one of the fastest DNS providers in the United States, evidences targeting of the United States because of the speed such companies provide to U.S. website visitors. Use of a company that offers fast speeds in the United States could be consistent with the desire to appeal to the U.S. market. But AMA has not provided evidence to suggest that Wanat chose this vendor or was motivated by a desire to appeal to the U.S. market or generate more U.S. users, as opposed to more users globally.[8]

---

[8] AMA relies on *UMG Recordings, Inc. v. Kurbanov*, 2020 WL 3476993 (4th Cir. June 26, 2020). But *Kurbanov* is distinguishable. The defendant in *Kurbanov* had "registered a Digital Millennium Copyright Act agent with the U.S. Copyright Office," "contracted with U.S.-based advertising brokers," and "relied on U.S.-based servers." *Id*. at *7. None of those specific actions aimed at the United States, including taking advantage of U.S. laws "for certain safe harbor defenses to copyright infringement claims," *id*., are present here. The dissent relies on *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), Dissent at 37, 39, but that case is likewise inapposite. The defendant magazine publisher in Keeton regularly circulated "some 10 to 15,000 copies of Hustler

In sum, the United States was not "the focal point" of the website "and of the harm suffered." *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 789).  AMA therefore has not shown Wanat purposefully directed his activities at the United States.  The district court correctly found that, on this record, it lacked specific jurisdiction over Wanat.[9]

# IV

## A

We next consider whether the district court abused its discretion by limiting the scope of AMA's jurisdictional

---

magazine" to customers in the forum state "each month."  *Id.* at 772. That sort of express aiming is also not present here.

[9] Because we hold that AMA has failed to meet its burden on the first prong of the minimum contacts test regarding purposeful direction, we do not need to reach the second and third prongs.  However, we would conclude that AMA also fails to satisfy the second and third prongs of the minimum contacts test.  Specifically, AMA has failed to show that its claims arise out of or relate to Wanat's forum-related activities and that the balance of factors supports the conclusion that exercising jurisdiction over Wanat would be unreasonable.  First, nothing more than AMA's contested bare allegations support any personal involvement by Wanat in uploading, encouraging the uploading, or intentionally failing to remove the infringing content.  Second, on balance, exercising jurisdiction over Wanat, a Polish citizen, would be unreasonable given his limited contacts with the forum, the burden on Wanat if he must defend in the forum, potential conflicts with Poland's sovereignty and its potential as an alternative forum.  *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993), *modified*, *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006).  While AMA has an interest in adjudicating its dispute in its chosen forum, we still conclude that the balance of factors weighs in favor of finding that jurisdiction over Wanat is unreasonable.

discovery on the basis of privacy concerns.[10]  *See Boschetto*, 539 F.3d at 1020.  We conclude it did not.

First, we consider de novo whether the district court made any legal error.  The district court denied certain jurisdictional discovery to AMA because, according to the Special Master's Report and Recommendation which was adopted in full, the PDP and the Court of Justice's *Schrems* decision barred Wanat from producing "personal data" to the United States because such disclosure might subject Wanat to criminal liability under Polish law.

AMA never made the Special Master or the district court aware of the Privacy Shield Decision, and therefore the district court did not err in failing to consider it.  The district court had no duty to identify sua sponte a change in law, particularly when—given the record before the district court—the legal change did not give AMA the right to obtain jurisdictional discovery.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).  The parties jointly recommended the Special Master, hired their own Polish law experts, and briefed the jurisdictional discovery issues before the Special Master issued its Report and Recommendation.  Notably, in an exhibit filed with the Special Master, Wanat's expert stated that changes to the European privacy laws were under consideration that could replace the PDP's "Safe Harbor" provision and affect the transfer of personal data to the United States.  AMA, however, did not address these

---

[10] On appeal, AMA only contests the district court's discovery rulings to the extent they implicate the PDP and *Schrems* decision.

potential changes to the PDP before the Special Master and did not raise the Privacy Shield Decision in its objections to the Report and Recommendation or motion for reconsideration.

It was not the district court or the Special Master's obligation to independently identify a change in law that may affect its jurisdictional analysis; that was AMA's responsibility.  AMA had notice and opportunity to raise the Privacy Shield Decision below, but failed to do so.  We therefore conclude that the district court did not abuse its discretion when it denied AMA the jurisdictional discovery it sought.

**B**

We next determine whether the Privacy Shield Decision, which was enacted while this case was before the district court, or the GDPR, which was enacted while this appeal was pending but not raised by AMA in its initial briefing, are matters that we should consider.

"Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so." *In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000).  We have exercised such discretion where:

> (1) there are exceptional circumstances why the issue was not raised in the trial court; (2) the new issue arises while the appeal is pending because of a change in the law; or (3) the issue presented is a pure question of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court.

*Raich v. Gonzalez*, 500 F.3d 850, 868 (9th Cir. 2007). Even if a case falls within one of these exceptions, we must "still decide whether the particular circumstances of the case overcome [the] presumption against hearing new arguments." *Id.* (quoting *Dream Palace v. Cty. of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004)). In making this decision, we must adhere to "the principle of party presentation." *Sineneng-Smith*, 140 S. Ct. at 1579. It is the parties who "frame the issues for decision," and we may entertain only those arguments "bearing a fair resemblance to the case shaped by the parties." *Id*. at 1579, 1582 (citation omitted).

## 1

The Privacy Shield Decision was implemented after the parties completed their briefing to the Special Master and before the Special Master's Report and Recommendation. But AMA never raised this change in law to the Special Master, to the district court, in its motion for reconsideration, or in opposition to Wanat's renewed motion to dismiss. Again, Wanat's expert had provided notice that a change in the European privacy laws was under consideration at the time the parties were briefing the issue to the district court and AMA had both notice and opportunity to raise this issue before the case was dismissed. Despite failing to raise the issue below or in its initial briefing, AMA claims in its supplemental brief that we should consider this new argument because the applicability of the new law is a pure question of law and Wanat will not be prejudiced by its consideration. We are not persuaded.

First, we reject AMA's argument regarding the Privacy Shield Decision because it is unrelated "to the case shaped by the parties." *Id*. at 1582. Although "[t]here are no doubt circumstances in which a modest initiating role for a court is

appropriate," *id*. at 1579, such circumstances are not present here. AMA had numerous opportunities to raise the Privacy Shield decision but did not do so until we ordered supplemental briefing.

Second, the proper vehicle for raising this issue would have been through a supplemental notice to the Special Master or the district court, or even in a motion for reconsideration before final judgment, not by raising it for the first time on appeal. *See* D. Ariz. R. LRCiv 7.2(g)(1) (Motions for Reconsideration) (2015) (motions for reconsideration should show "manifest error or a showing of new facts or legal authority that could not have been brought to [the court's] attention earlier with reasonable diligence"); *see also Rentrop v. Spectranetics Corp.*, 550 F.3d 1112, 1117 (Fed. Cir. 2008) ("[W]hen there is a relevant change in the law before entry of final judgment, a party generally must notify the district court; if the party fails to do so, it waives arguments on appeal that are based on that change in the law."); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152 (11th Cir. 2011) (adopting the analysis of *Rentrop* to find that plaintiff's failure to file a motion for reconsideration to notify the district court before entry of final judgment waives arguments on appeal based on the change in law).

Third, no exceptional circumstances warrant application of the Privacy Shield Decision to AMA's argument for additional jurisdictional discovery. "A party's unexplained failure to raise an argument that was indisputably available below is perhaps the least 'exceptional' circumstance warranting our exercise of this discretion." *G & G Prods. LLC v. Rusic*, 902 F.3d 940, 950 (9th Cir. 2018). Moreover, application of the Privacy Shield Decision is not a pure question of law. Whether the Privacy Shield Decision would

weigh in favor of permitting additional jurisdictional discovery depends on whether AMA is a self-certified organization under the Privacy Shield Decision, which is plainly a factual question. For the same reason, resolving this issue in AMA's favor would prejudice Wanat because AMA is asking for remand to develop the factual record as to whether AMA satisfied the Privacy Shield Decision's self-certification requirements. *See Raich*, 500 F.3d at 868. In sum, we decline to take up the application of the Privacy Shield Decision for the first time on appeal. *See El Paso City*, 217 F.3d at 1165.

**2**

Similarly, before AMA filed its opening brief in this appeal—and after AMA had already been granted two extensions to file its opening brief—the European Parliament repealed and replaced the PDP with the GDPR. Although AMA had the opportunity to bring this change to our attention its opening or reply brief, it did not do so. This was raised for the first time after we withdrew submission of this case and specifically requested briefing on potential waiver and the impact of the Privacy Shield Decision.

Consistent with "the principle of party presentation," *Sineneng-Smith*, 140 S. Ct. at 1579, we decline to consider AMA's untimely argument regarding the GDPR. In particular, we are not persuaded that we should entertain this argument where the party that could benefit from the new law did not raise it in its briefs, although it had notice and opportunity to do so, and only discussed it in a supplemental brief filed at our request. *See Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148–49 (9th Cir. 2016) ("[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal

questions presented and argued by the parties before them.") (internal quotation marks omitted).

In addition, since the GDPR replaced the PDP, any consideration of the GDPR would necessarily require an analysis of how the GDPR and the Privacy Shield Decision interrelate. We have already declined to consider the Privacy Shield Decision, which further counsels against analyzing the GDPR. Finally, as previously discussed, AMA has not claimed or presented evidence that it has satisfied either the Privacy Shield Decision or the GDPR's requirements for receiving personal data. *See supra* at IV.B.1.

## V

AMA has not shown that Wanat purposefully directed his suit-related conduct at the United States. Nor did the district court abuse its discretion in denying AMA jurisdictional discovery. And we decline to consider new arguments that AMA raises for the first time in response to our order for supplemental briefing, and which implicate facts not in the record. We therefore affirm.

**AFFIRMED.**

IKUTA, Circuit Judge, concurring:

I concur in the majority opinion in full.  I write separately to clarify the posture of this case in light of our decision.

Today we hold that the district court did not err in granting Wanat's motion to dismiss for lack of personal jurisdiction.  We also affirm the district court's denial of AMA's motion for additional jurisdictional discovery and its entry of final judgment against AMA.

And that means this case is over.  When a court lacks personal jurisdiction over a defendant, it has no "authority to bind a . . . defendant to a judgment," *Walden v. Fiore*, 571 U.S. 277, 283 (2014), and must dismiss the case against the defendant, *see*, *e.g.*, *id.* at 281.  The defendant is not "amenable to proceedings," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 311 (1943), and is shielded from "the burdens of litigating" in that forum, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  Congress has provided one exception to this general rule:  a court that lacks personal jurisdiction over a defendant may transfer the case to another district court where the case "could have been brought."  28 U.S.C. § 1406(a); *see Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 465 (1962).  This exception is not applicable here; there is no place where this case could have been brought because Wanat lacks sufficient contacts with the United States as a whole. *See* Maj. Op. at 21.

In his concurrence, Judge Nelson suggests that "perhaps the door remains slightly open for further proceedings on remand." Conc. at 29. The dissent agrees. Dissent at 33 n.1. But neither Judge Nelson nor the dissent cites any statute or judge-made rule authorizing a district court to exercise power over a party in the absence of personal jurisdiction. Because the district court lacks personal jurisdiction over

Wanat, it now has the authority to do only one thing:  remove this case from its docket in accordance with its ordinary procedure.

---

R. NELSON, concurring:

I write separately to address potential issues left open in light of our decision to affirm the district court's order dismissing the complaint.  While the presumption may be that our decision fully resolves this case, perhaps the door remains slightly open for further proceedings on remand. *See Hampton v. Pac. Inv. Mgmt. Co.*, 869 F.3d 844, 846 (9th Cir. 2017) ("Dismissals for lack of subject-matter jurisdiction . . . must be without prejudice, because a lack of jurisdiction deprives the dismissing court of any power to adjudicate the merits of the case.") (citation omitted).  We hold that the district court did not abuse its discretion when it denied certain jurisdictional discovery to AMA.  We also decline to exercise our discretion to review AMA's new legal claims, raised for the first time on appeal, regarding the impact of intervening foreign law on its jurisdictional discovery requests.

I do not understand our opinion, however, to preclude the district court from exercising its discretion on remand to consider intervening law in any supplemental request for jurisdictional discovery or amendment of AMA's complaint. As we discuss, changes in European law—specifically, the Privacy Shield Decision and GDPR—may have opened the door for companies based in the United States to obtain personal data that may not have previously been available under the PDP.

On remand, the district court may wish to allow AMA to amend its complaint or request additional briefing to consider whether the Privacy Shield Decision and GDPR have altered the analysis on available jurisdictional discovery.[1] To be sure, the current record is silent whether AMA could benefit through self-certification under the Privacy Shield Decision or the GDPR. And AMA has provided no evidence on appeal that it has self-certified. However, these are issues that the district court may wish to evaluate on remand.

If additional jurisdictional discovery is ordered, Wanat's contacts with the United States may be shown to be more significant than the current record demonstrates. For example, ePorner refused to produce any of its advertising agreements. Wanat's expert stated he could not conclusively determine that ePorner only used "ad networks rather than more directly negotiating with advertisers in addition to the ad network." Evidence that Wanat negotiated with advertisers directly may reveal whether he intended to target U.S. users. Similarly, evidence that Wanat engaged Tiggee for the purpose of targeting U.S. forum residents may affect the analysis as well. The extent of these contacts could also affect the reasonableness analysis.

If the district court does decide that additional jurisdictional analysis is warranted on remand, one additional issue—and potentially a threshold one for

---

[1] Assuming AMA followed the self-certification procedures, I would be concerned with an interpretation of either the Privacy Shield Decision or the GDPR that would wholly prevent Wanat from producing jurisdictionally relevant "personal data." Significant safeguards are available for producing even the most sensitive and confidential data. Moreover, Wanat's counsel at oral argument agreed Wanat would comply with a discovery order, notwithstanding the GDPR.

jurisdictional discovery—may be considered. AMA argues that MW Media's and Madon's U.S. contacts may be imputed to Wanat because MW Media is a civil law partnership between Wanat and Madon, which, under Polish law, has no legal personality and cannot be sued. Therefore, AMA claims that because Wanat is jointly liable for the debts and obligations of the partnership, any contact by the partnership may be attributed to Wanat for jurisdictional purposes. This could become an important issue impacting what jurisdictional discovery is relevant and what contacts may support the court's jurisdiction over Wanat.

We previously considered whether a partnership's contacts could be imputed to a partner for jurisdictional purposes in *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990), and held that a Florida law firm's contacts with California could not be attributed to its individual partners. Like AMA's argument here, "[t]he Shers contend[ed], without benefit of case support, that because the liability of the partnership would establish the joint and several liability of each individual partner, . . . jurisdiction over the partnership establishes jurisdiction over the partners." *Id.* (internal citation omitted). We disagreed, explaining, "[l]iability and jurisdiction are independent" and "[r]egardless of their joint liability, jurisdiction over each defendant must be established individually." *Id.*

Relying on the general rule that "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal," we held that "because each partner acts as an agent of the partnership when carrying on the business of the partnership," "[t]he contacts of the partners may establish jurisdiction over the partnership." *Id.* at 1362, 1366. However, the inverse is not ordinarily true. "[W]hile each partner is generally an agent of the *partnership* for the

purpose of its business, he is not ordinarily an agent of his *partners.*" *Id.* at 1366. "Thus, a partner's actions . . . ordinarily may not be imputed to the other partners." *Id.* We did not, however, foreclose the possibility that a forum's partnership law may create an agency relationship between partners. In such circumstances, the general rule would apply and a partnership's contacts with a forum may be attributed to its partners.

If further proceedings on jurisdiction occur, the district court should determine whether Polish law creates an agency relationship between partners and other persons such that the contacts of Madon or MW Media may be imputed to Wanat and whether such a ruling would impact jurisdictional discovery or the jurisdictional analysis.

---

GOULD, Circuit Judge, dissenting:

Our precedents establish that we have the authority to exercise personal jurisdiction over a defendant who has, among other things, expressly aimed his tortious conduct at the United States. That authority allows us "to hold [a defendant] answerable . . . for the contents of a website whose economic value turns, in significant measure, on its appeal to [forum residents]." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011). In determining whether there is jurisdiction, we may infer from "[t]he fact that [a defendant's] advertisements targeted [forum] residents . . . that [the defendant] knows—either actually or constructively—about [the forum's] user base, and that it exploits that base for commercial gain by selling space on its website for advertisements." *Id.*

Here, Defendant-Appellee Marcin Wanat operates a website, ePorner.com, which prior to this suit attracted nearly 20% of its user base and, as a result, substantial advertising profits from the United States market; utilized domain name servers (DNS) of a United States company that specifically brands itself as increasing internet speeds in the United States; and employed Terms of Service that invoked the protections of United States law.  If we take the undisputed facts alleged by Plaintiff-Appellant AMA Multimedia as true and resolve any factual disputes in its favor—as we must—Wanat has targeted his economic activity toward the United States and may properly be haled into court here.  The majority, in reaching the contrary conclusion, unduly restricts the authority of United States courts to hold alleged, foreign tortfeasors to account and incorrectly curtails our established precedents.  I respectfully dissent.[1]

---

[1] Because I would hold that there is already personal jurisdiction over Wanat, I do not here opine on the majority's decision to affirm the denial of further jurisdictional discovery without considering arguments raised for the first time on appeal.  However, like the view expressed in Judge Nelson's separate concurrence, I do not doubt that the district court has discretion on remand to grant AMA leave to amend its complaint or to conduct further jurisdictional discovery in light of changes in international law.  The district court may wish to do so in recognition of courts' greater discretion to consider questions of foreign law not initially raised by the parties, given "the peculiar nature of the issue of foreign law."  *See* Fed. R. Civ. P. 44.1 advisory committee's note to 1966 adoption.  Especially in a case such as this, with important interests of the United States' ability to enforce domestic intellectual property rights at stake, there are good reasons to ensure that the appropriate international law is applied.  *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (one factor in international disclosure disputes is "the extent to which noncompliance with the [discovery] request would undermine important interests of the United States").

**I**

Because the majority summarizes most of the key facts, I reiterate only those most relevant to the personal jurisdiction analysis. First, Defendant Marcin Wanat is a Polish citizen and partner in MW Media, S.C., which owns and operates the adult video website ePorner.com. Allegedly, ePorner.com has infringed copyrighted materials of Plaintiff AMA Multimedia, which is a Nevada limited liability company. After being sued by AMA in the District of Arizona, Wanat filed a motion to dismiss for lack of personal jurisdiction.

Although no facts in the current record show that Wanat directly conducts activity within the United States, it is undisputed that ePorner.com's most important commercial market is the United States: 19.21% of its website traffic comes from the United States, while Germany makes up the second largest market, comprising 13.67% of the website traffic. No other country accounts for more than 6% of the traffic to the site. In turn, ePorner.com's business model turns solely on advertising profits, and it uses third parties to geolocate advertisements based on a visitor's perceived location. Because of the higher premiums placed on U.S.-focused advertising, the U.S. market likely makes up an even greater proportion of ePorner.com's profits than its user base would suggest.

While ePorner.com now stores its videos on a server in the Netherlands, before this suit it principally used the domain name servers of U.S.-based Tiggee LLC, which claims to provide the fastest internet speeds in the eastern United States and second fastest in the western United States. Also, ePorner.com's Terms of Service as of 2015 stated that the website content was "owned by and/or licensed to Eporner, subject to copyright and other

intellectual property rights under United States, Canada and foreign laws and international conventions."

After denying certain jurisdictional discovery, the district court dismissed the suit for lack of personal jurisdiction, and AMA appealed.

## II

We review *de novo* a district court's dismissal for lack of personal jurisdiction. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1067 (9th Cir. 2017). Where the determination of personal jurisdiction is "based on written materials rather than an evidentiary hearing, [a plaintiff] need only make a prima facie showing of jurisdictional facts." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). "Uncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor," *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018), so long as the plaintiff does not "simply rest on the bare allegations of its complaint," *Schwarzenegger*, 374 F.3d at 800 (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

## III

Personal jurisdiction under the federal long-arm statute, Federal Rule of Civil Procedure 4(k)(2), must comport with due process; in this instance, where specific jurisdiction is at issue, the defendant must have "minimum contacts" with the forum of the United States, and the exercise of jurisdiction must not be unreasonable. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007) ("The due

process analysis under Rule 4(k)(2) is nearly identical to traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between [the defendant] and the forum state, we consider contacts with the nation as a whole."); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The familiar requirements for specific jurisdiction are as follows:  (1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[] himself of the privileges of conducting activities in the forum"; (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."  *Axiom*, 874 F.3d at 1068 (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).

The majority correctly identifies the "effects test" derived from *Calder v. Jones*, 465 U.S. 783 (1984) as the appropriate standard by which to gauge whether Wanat purposefully directed his activities toward the United States.  Under the effects test, "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)).  The majority also correctly holds that Wanat committed an intentional act for purposes of jurisdiction.  The majority then goes astray, however, by concluding that Wanat did not expressly aim his conduct toward the United States, and that mistake defeats jurisdiction.  Our precedents dictate otherwise, so I would hold that there is personal jurisdiction over Wanat.

## A

A defendant who operates a passive website "expressly aims" at a forum if he engages in "conduct directly targeting the forum." *Mavrix*, 647 F.3d at 1229.[2]  We have held that this requirement was satisfied when a defendant "continuously and deliberately exploited" the forum's market for commercial gain, by operating "a website whose economic value turns, in significant measure, on its appeal to [forum residents]." *Id.* at 1230; *accord Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984) ("Where, as in this case, [the defendant] has continuously and deliberately exploited the New Hampshire market [by selling magazines], it must reasonably anticipate being haled into court there . . . based on the contents of its magazine."). In other words, express aiming is present where a defendant "anticipated, desired, and achieved a substantial [U.S.] viewer base." *Mavrix*, 647 F.3d at 1230.

Here, there should be little question that these conditions are satisfied.  As in *Mavrix*, ePorner.com's business model depends on "selling advertising space on its website to third-party advertisers:  the more visitors there are to the site, the more hits that are made on the advertisements; the more hits that are made on the advertisements, the more money that is paid by the advertisers to [ePorner.com and Wanat]." *Id.* ePorner.com's ads are geolocated to the perceived location

---

**2** It is worth noting that ePorner.com is more than a purely passive website because it has interactive features that "that involve the knowing and repeated transmission of computer files over the Internet," *Mavrix*, 647 F.3d at 1226 (quotations omitted), and "visitors must agree to certain terms and conditions" in order to make full use of the site, *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 353 (4th Cir. 2020).  In any event, regardless of whether the site is passive, interactive, or semi-interactive, jurisdiction is proper here.

of its visitors, and at nearly 20% of the website's traffic, the United States audience is "substantial" and in fact makes up a larger proportion of ePorner's user base than any other country, by a significant margin.

"[I]mmaterial [of] whether the third-party advertisers or [ePorner and Wanat] targeted [United States] residents," "[t]he fact that the advertisements targeted [U.S.] residents indicates that [ePorner] knows—either actually or constructively—about its [U.S.] user base, and that it exploits that base for commercial gain by selling space on its website for advertisements." *Id.*; *see also Kurbanov*, 963 F.3d at 348, 353–54 (in finding jurisdiction, reasoning that "[w]hile [the defendant] outsourced the role of finding advertisers for the Websites to brokers, the fact remains that he earns revenues precisely because the advertising is targeted to visitors in [the forum]" through "geolocation" or "geo-targeting"). This is especially true where, as here, ePorner has contracted with a U.S.-based DNS company that specifically markets itself as providing fast internet speeds in the United States.[3] The straightforward conclusion is that the United States "audience is an integral component of [ePorner's] business model and its profitability," and that "it does not violate due process to hold [ePorner or Wanat] answerable in a [U.S.] court for the contents of a website whose economic value turns, in significant measure, on its appeal to [U.S. residents]." *Mavrix*, 647 F.3d at 1230.

---

[3] ePorner also used Terms of Service that invoked the protections of United States copyright and trademark law. While the cursory reference to U.S. law in these Terms would not be sufficient on its own to establish express aiming, it lends further support to the conclusion, in conjunction with the rest of the website's operations, that ePorner's contacts with the United States were more than merely "random, isolated, or fortuitous." *Keeton*, 465 U.S. at 774.

The majority resists this conclusion by seeking to distinguish *Mavrix* from the present case and throwing up roadblocks that can be found nowhere in our precedents— and that, in some instances, flatly contradict our precedents.

Among other things, the majority suggests that personal jurisdiction is improper because Wanat and ePorner lacked a "forum-specific focus," noting that "the market for adult content is global." *See Maj. Op.* at 16–17. But it is well-established that no forum-specific requirement exists. In *Keeton*, the Supreme Court held that New Hampshire had personal jurisdiction over a national magazine even though the magazine distributed fewer copies in that state than others and even though "the bulk of the harm done to [the plaintiff] occurred outside New Hampshire." 465 U.S. at 780. Because the magazine "continuously and deliberately exploited the New Hampshire market . . . [t]here is no unfairness in calling it to answer for the contents of that publication." *Id.* at 781. Similarly, our own court has stated that so long as "a jurisdictionally sufficient amount of harm is suffered in the forum . . . , it does not matter that even more harm might have been suffered in another [forum]." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc) (per curiam); *see also Mavrix*, 647 F.3d at 1230–31 (finding jurisdiction in California despite the fact that the defendant more generally "sought and attracted [a] nationwide audience[]"). Here, the market for adult content is not uniquely and exclusively American, but Wanat should nonetheless be held accountable in a United States court because he has "continuously and deliberately exploited" the U.S. market. *See Keeton*, 465 U.S. at 781.

The majority misreads *Mavrix*. *Mavrix* did not hold that personal jurisdiction is proper only when a website has a

unique appeal in the forum, nor did it depend fundamentally on the website's forum-specific subject matter, as the majority contends, *see Maj. Op.* at 16–17. Rather, in *Mavrix*, "[t]he record [did] not reflect how many of the website's visitors are California residents." 647 F.3d at 1222. In light of that absence, we focused on the subject matter of the website (celebrity gossip) as *evidence* that the website had significant appeal in the California forum. *Id.* at 1230. We then considered that subject matter along with "the size and commercial value of the California market"—not with the unknown size and commercial value of the website's California user base—to *infer* that "[t]his audience is an integral component of [the defendant's] business model and its profitability." *Id.* Unlike *Mavrix*, we need not rely on the subject matter of ePorner.com as evidence from which to infer the site's appeal in the forum: The record *directly shows* that ePorner.com appeals to a significant U.S. audience and that it contracts with a U.S.-based DNS company which markets itself as providing faster internet speeds to U.S. users. To hold that there is no express aiming here is to construe the facts in the light *least* favorable to the plaintiff and to blind ourselves to the clear inference that ePorner "knows—either actually or constructively—about its [U.S.] user base, and that it exploits that base for commercial gain by selling space on its website for advertisements." *Id.*[4]

---

[4] Nor is there truth in the majority's rejoinder that finding jurisdiction here would mean that "ePorner could be said to expressly aim at *any* forum in which a user views the website." *Maj. Op.* at 19. This contention ignores the fact that a defendant must have "anticipated, desired, and achieved a *substantial* [forum] viewer base," *Mavrix*, 647 F.3d at 1230 (emphasis added), and that its contacts cannot be merely "random, isolated, or fortuitous," *Keeton*, 465 U.S. at 774. Exercising jurisdiction where, as here, the United States is *the* most

The majority apparently grounds its reluctance to make this plain inference, in part, on *Walden v. Fiore*, 571 U.S. 277 (2014), by reasoning that foreseeability of harm to the plaintiff in the forum cannot alone establish minimum contacts and that only the defendant's own contacts with the forum can provide the basis for jurisdiction. *See Maj. Op.* at 17–19 & n.6. These propositions are undeniably true. They are also beside the point.

First, foreseeability of harm to the plaintiff principally relates not to the express aiming analysis, but to the third prong of the effects test—whether the defendant "caus[ed] harm that the defendant knows is likely to be suffered in the forum." *Mavrix*, 647 F.3d at 1228. Although individualized targeting "will not, on its own, support the exercise of specific jurisdiction" after *Walden*, it is still "relevant to the minimum contacts inquiry." *Axiom*, 874 F.3d at 1070. Indeed, that is the only way that the second and third prongs of the effects test do not entirely collapse into each other.

Second, *Walden* stands for the proposition that a defendant may not simply rely on a plaintiff's contacts with the defendant and the forum to establish personal jurisdiction. *Walden*, 571 U.S. at 289. That principle of due process, however, does not make a defendant immune from suit when the "'effects' of the alleged [tortious conduct] connect[] the defendant[] to [the forum], not just to the plaintiff." *Id.* at 287. The majority elides this important distinction, asserting that, "[t]o find specific jurisdiction based on [users in the forum receiving targeted advertisements] would run afoul of the Supreme Court's directive in *Walden* and 'impermissibly allow[] a plaintiff's

---

integral market to the defendant's profitability will not result in the majority's "sky-is-falling" scenario.

contacts with the defendant and forum to drive the jurisdictional analysis.'" *Maj. Op.* at 19 (quoting *Walden*, 571 U.S. at 289). But the defendant's own intentional contacts with *users* in the forum have nothing to do with the plaintiff. And as I have explained, the facts here show that Wanat "knows—either actually or constructively—about [ePorner.com's U.S.] user base, and that [he] exploits that base for commercial gain by selling space on [the] website for advertisements." *Mavrix*, 674 F.3d at 1230.

Taking AMA's uncontroverted allegations as true and resolving factual disputes in its favor, there is more than enough here to conclude that Wanat, through ePorner, expressly aimed his conduct at the United States. The second prong of the effects test should have been resolved in AMA's favor.

**B**

The third prong of the effects test is also clearly satisfied. Because ePorner allegedly violated the intellectual property rights of AMA, which is headquartered in the United States, and because the harm involves the potential diversion of U.S. users and revenues from AMA's own platforms, Wanat's express aiming is "causing harm that [he] knows is likely to be suffered in the forum." *See Brayton Purcell*, 606 F.3d at 1131 (it is foreseeable that a plaintiff will be "harmed by infringement of its copyright[s and trademarks], including harm to its business reputation and goodwill, and decreased business and profits"); *Mavrix*, 647 F.3d at 1231 ("[A] corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business." (quoting *Dole Food*, 303 F.3d at 1113)). All of the requirements of the *Calder* effects test have been met.

## C

Having established purposeful direction, the next step in the minimum contacts inquiry is to consider whether the claim "arises out of or relates to the defendant's forum-related activities." *Axiom*, 874 F.3d at 1068 (quoting *Dole Food*, 303 F.3d at 1111)). This step, too, straightforwardly supports jurisdiction. Wanat operates ePorner.com. That website allegedly displayed infringing videos, causing harm to AMA in the United States. But for Wanat's operation of ePorner.com, AMA would not have been harmed in the forum. The harm to AMA arises out of Wanat's U.S. contacts. *Cf. Mavrix*, 647 F.3d at 1228 ("[The plaintiff's] claim of copyright infringement arises out of [the defendant's] publication of the photos on a website accessible to users in the forum state.").[5]

## D

Because all other requirements for specific jurisdiction have been met, the final inquiry is whether it is reasonable to exercise personal jurisdiction over Wanat. *Schwarzenegger*, 374 F.3d at 802. We balance seven factors in making that determination:

---

[5] Because the majority dismisses the case at the purposeful direction step, it only briefly addresses, in one sentence in a footnote, whether the claim arises out of or relates to the defendant's forum-related activities and concludes that it does not. *See Maj. Op.* at 21 n.9. Its only stated reason is that "nothing more than AMA's contested bare allegations support any personal involvement by Wanat in uploading, encouraging the uploading, or intentionally failing to remove the infringing content." *Id.* But it is not contested that Wanat, through his partnership MW Media, assists in operating ePorner.com. The majority's cursory, non-binding dicta cannot withstand scrutiny.

(1) the extent of the defendant's purposeful interjection into the forum['s] affairs;

(2) the burden on the defendant of defending in the forum;

(3) the extent of conflict with the sovereignty of the defendant's [country];

(4) the forum['s] interest in adjudicating the dispute;

(5) the most efficient judicial resolution of the controversy;

(6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and

(7) the existence of an alternative forum.

*Freestream Aircraft*, 905 F.3d at 607. The burden is on Wanat "to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)); *accord Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1132 (9th Cir. 2003). Wanat has not done so.

On the one hand, forcing Wanat to litigate in the United States would almost certainly impose substantial burdens on him and raise sovereignty and efficiency concerns.[6] But on

---

[6] It is notable, however, that Wanat has "not presented evidence that the inconvenience is so great as to constitute deprivation of due process." *Freestream Aircraft*, 905 F.3d at 608 (quotations omitted).

the other, Wanat has purposefully interjected himself in the forum by operating a website that continuously and deliberately exploited the U.S. market, *see CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1080 (9th Cir. 2011), and the United States has a strong interest in enforcing federal intellectual property laws and providing redress for injuries felt within its borders. In light of these competing concerns, like in *Harris Rutsky*, "[t]he balance is essentially a wash," and Wanat has not met his burden to present a "compelling case" that the exercise of jurisdiction would be unreasonable. *Harris Rutsky*, 328 F.3d at 1134; *accord Freestream Aircraft*, 905 F.3d at 609. I would hold that the United States has personal jurisdiction over Wanat.

## IV

The majority's holding today conflicts with our precedents and unduly restrains our ability to hold foreign tortfeasors accountable for conduct purposefully directed at the United States and causing harm in the United States. I respectfully dissent.